Patrick ESCH, et al.

v.

Clayton K. YEUTTER, Secretary, U.S. Department of Agriculture, Appellant.

No. 87–5340.

United States Court of Appeals, District of Columbia Circuit.

Argued April 12, 1988.

Decided May 25, 1989.

John M. Facciola, Asst. U.S. Atty., with whom Jay B. Stephens, Joseph E. diGenova, U.S. Attys., John D. Bates, R. Craig Lawrence, Michael J. Ryan, Royce C. Lamberth, Asst. U.S. Attys., and Terrence G. Jackson, Atty., Dept. of Agriculture, Washington, D.C., were on the brief, for appellant.

William R. Scanlin, Washington, D.C., and Walter S. Boone, III, of the bar of the Dist. of Columbia Court of Appeals, pro hac vice, by special leave of Court, with whom Scott A. Mills, Falls Church, Va., was on the brief, for appellees. Alexander J. Pires, Jr., Washington, D.C., also entered an appearance for appellees.

Before WALD, Chief Judge, and ROBINSON and STARR,* Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

* Circuit Judge STARR did not participate in this opinion.

1. *Esch v. Lyng,* 665 F.Supp. 6 (D.D.C.1987).

2. *Id.* at 8.

3. *Id.* at 11–13.

4. *Id.* at 15.

5. *Id.* at 11. Since appellees eschew any order requiring payment to them of any sum of money, we need not decide whether a claim therein

**SPOTTSWOOD W. ROBINSON, III,** Circuit Judge:

The Esch family has farmed in the United States for more than a century. Currently, nine brothers and sisters own a 20,000-acre wheat and corn farm in Baca County, Colorado. They challenged in the District Court a decision by the Department of Agriculture to partially suspend their participation in two federal farm subsidy programs.[1] That court overruled the Department's objection that subject-matter jurisdiction lay in the United States Claims Court[2] and, after supplementing the agency record with testimony by agency decisionmakers,[3] granted in large part the relief sought.[4]

We conclude that the District Court was to adjudicate the case. We find that the circumstances warranted supplementation of the agency record to ensure effective judicial review. We sustain the court's conclusion that the Department fatally departed from its own regulations in meting out the suspension under attack. We modify the court's judgment in one respect, and affirm it as modified.

## I. JURISDICTION

A. *The Problem*

In the District Court, appellees pressed for annulment of the Department's decision to suspend $628,055.33 in program payments assertedly due them.[5] They predicated jurisdiction upon the general federal-question statute,[6] and a waiver of sovereign immunity upon the judicial review provision of the Administrative Procedure Act.[7]

The Department assails the District Court's assumption of jurisdiction on the

might still have been cognizable. See, however, *Bowen v. Massachusetts,* 484 U.S. ——, ——, 108 S.Ct. 2722, 2740–2741, 101 L.Ed.2d 749, 773–775 (1988).

6. 28 U.S.C. § 1331 (1982) ("[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").

7. 5 U.S.C. § 702 (1982).

ground that appellees' claim is really one for money damages in excess of $10,000, and as such is cognizable only in the Claims Court.[8] The Tucker Act vests in the Claims Court jurisdiction [9] over

> any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States....[10]

The Department argues that

> because the only possible effect of the injunction the Esches sought and the court awarded was to require the Secretary to make payments to the Eschs, this action, in effect, was one for monetary relief exceeding $10,000 and should have been dismissed or transferred to the Claims Court.[11]

Appellant maintains that appellees' suit

> was founded either upon the Constitution (their due process claim), a regulation of an executive department (7 C.F.R.

§ 795), or an express contract with the United States....[12]

### B. *The Decision in Bowen v. Massachusetts*

One might seriously question whether appellees' claim falls under either the Tucker Act's contractual [13] or noncontractual [14] jurisdiction. At any rate, we reject the fundamental premise of the Department's argument—that appellees' action is for money damages, and therefore must be brought in the Claims Court. Our decision on jurisdiction pivots on *Bowen v. Massachusetts*,[15] wherein the Supreme Court expressly repudiated the notion that suits seeking monetary relief from the Federal Government are necessarily suits seeking "money damages" cognizable exclusively in the Claims Court.[16]

In reaching its decision, the Court looked first to the APA's waiver of federal sovereign immunity in Section 702 [17] and its specifications in Section 704 regarding ac-

---

**8.** Brief for Appellant at 14–18. For money damages claims against the United States up to $10,000, the "little" Tucker Act vests concurrent jurisdiction in the United States district courts and the United States Claims Court. 28 U.S.C. § 1346(a)(2) (1982) ("little" Tucker Act); *id.* § 1491(a)(1) (1982) (Tucker Act). The Claims Court's jurisdiction over claims against the United States has no maximum dollar limitation.

**9.** The Claims "Court's jurisdiction is 'exclusive' to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court." *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— n. 48, 108 S.Ct. at 2740 n. 48, 101 L.Ed.2d at 774 n. 48.

**10.** 28 U.S.C. § 1491(a)(1).

**11.** Brief for Appellant at 15.

**12.** Brief for Appellant at 16.

**13.** If appellees' suit is not based on a contract with the Federal Government, it cannot lie within the Claims Court's contractual jurisdiction. See 28 U.S.C. § 1491(a). Although appellees signed "contracts" with the Federal Government, and although the Department's regulations denominate the documents executed by the Federal Government and program participants as "contracts," see 7 C.F.R. § 704.1 (1988) (conservation reserve program); *id.* §§ 713.49, 713.50 (1988) (price support program),

we see no reason to assume that what is involved here is a contract within the meaning of the Tucker Act. As the Supreme Court recently noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." [Appellees'] claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties. It seems to us, then, that [appellees'] claims are not contract claims for Tucker Act purposes.
*Maryland Dep't of Human Resources v. HHS*, 246 U.S.App.D.C. 180, 188, 763 F.2d 1441, 1449 (1985) (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590, 601 (1985)) (citations omitted).

**14.** See notes 61 and 78–80 *infra* and accompanying text.

**15.** *Supra* note 5.

**16.** See note 41 *infra* and accompanying text. *Bowen* was decided after submission of the case at bar to this court, and necessitated careful study and extensive reexamination of the record on appeal.

**17.** 484 U.S. at —— ——, 108 S.Ct. at 2731–2736, 101 L.Ed.2d at 762–768.

tions reviewable in federal courts.[18] Section 702 provides in relevant part:

> A person suffering legal wrong because of agency action ... is entitled to judicial review thereof. An action in a court of the United States *seeking relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.[19]

Section 704 extends reviewability generally to "final agency action," [20] but only if "there is no other adequate remedy in a court." [21] The Court then considered and rejected the proposition that an action complaining of an agency's disallowance of a federal grant is necessarily one for "money damages" beyond the purview of the APA's waiver of sovereign immunity.[22]

### C. Availability of APA Review

With the benefit of the analysis in *Bowen*, we approach the question whether the Esch suit is cognizable under the APA.[23] At issue here, as in *Bowen*, is whether the suit is one "seeking other than money damages" and therefore within Section 702's waiver of immunity.[24] It might also be ascertained whether litigation of the controversy in the District Court was bound by Section 704 because of the availability of an adequate remedy in another court.[25] To these and related problems we now

---

**18.** *Id.* at ——, 108 S.Ct. at 2736–2739, 101 L.Ed. 2d at 768–773.

**19.** 5 U.S.C. § 702 (1982) (emphasis added). The section explains that

[the] United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.... Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**20.** 5 U.S.C. § 704 (1982), reading in full:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**21.** *Id.*

**22.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at ——, 108 S.Ct. at 2731–2736, 101 L.Ed.2d at 762–768. This aspect of *Bowen* is fully dis-

cussed later. See Part I(C)(2) *infra* and accompanying text.

**23.** "[I]t is common ground that if review is proper under the APA, the District Court had jurisdiction under 28 U.S.C. § 1331." *Id.* at —— n. 16, 108 S.Ct. at 2730 n. 16, 749 L.Ed.2d at 762 n. 16. Inquiry into the availability of Tucker Act jurisdiction is still appropriate, however, in determining whether a litigant has an adequate remedy in another court. See *id.* at —— – ——, 108 S.Ct. at 2736–2739, 101 L.Ed.2d at 768–773. See also Part II(C)(2) *infra*.

**24.** This question is not novel in this Circuit. In *Maryland Dep't of Human Resources v. HHS, supra* note 13, which was cited extensively and with approval in *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— – ——, 108 S.Ct. at 2732–2733, 2734–2736, 101 L.Ed.2d at 764–765, 767–768, we held that an action by a state for allegedly wrongful disallowance of Social Security funding was one for specific relief, not money damages, and so was not barred by § 702's "money damages" restriction. We ourselves reaffirmed *Maryland Dep't of Human Resources in National Ass'n of Counties v. Baker*, 268 U.S.App. D.C. 373, 377, 842 F.2d 369, 373 (1988). Additionally, at the time of *Bowen*, five circuits had held that "district courts have jurisdiction over a State's appeal from a federal administrative disallowance in a grant-in-aid program." 484 U.S. at —— n. 1, 108 S.Ct. at 2726 n. 1, 101 L.Ed.2d at 756 n. 1 (listing cases).

**25.** This phrasing of the issue reflects the Court's teaching in *Bowen* that § 704 only codified the exhaustion requirement, as opposed to the broader proposition that it divided responsibili-

turn.[26]

*Bowen* concerned the Department of Health and Human Services' administration of the federal Medicaid grant program, which authorizes reimbursement of state medical expenditures for services that are rehabilitative in nature.[27] When HHS concludes that a state is making unauthorized expenditures,[28] it may either initiate a compliance proceeding, the result of which is judicially reviewable in the courts of appeals,[29] or merely disallow federal funds for a particular item or category of items, for which no judicial review is expressly authorized by the Medicaid statute.[30]

Massachusetts' Medicaid program covered the expenses of mentally retarded persons in intermediate care facilities, which were staffed and administered jointly by the State's Departments of Mental Health and Education.[31] HHS concluded that expenditures made for persons in facilities were not for rehabilitative services because they were rendered partly by Department of Education personnel.[32] Consequently, it disallowed $6,414,964 in payments.[33]

After exhausting its administrative remedies,[34] Massachusetts sued in a federal district court, invoking general federal-question jurisdiction[35] and asserting a Section 702 waiver of federal sovereign immunity.[36] That court, without questioning its power to do so, issued an injunction after concluding that the state's "services in question were in fact rehabilitative."[37] The injunction

> simply "reversed" the Board's decision disallowing reimbursement of the sum of $6,414,964 in [federal financial participation] under the Medicaid program.... [I]n a second opinion relying on the analysis of the first, the court reversed the Board's second disallowance determination. It entered an appropriate judgment.... That judgment did not purport to state what amount of money, if any, was owed by the United States to Massachusetts, nor did it order that any payment be made.[38]

The case eventually reached the Supreme Court, which in the course of its decision addressed the meaning of Section 702's "money damages" restriction and Section

---

ty for judicial review among the various federal courts. See Part I(C)(2) *infra.*

**26.** We begin with an analysis of the facts in *Bowen.* Text *infra* at notes 27–39. We follow with discussion of the effect of § 702's waiver of sovereign immunity. Part I(C)(1) *infra.* We then address § 704's limitation on APA review. Part I(C)(2) *infra.*

**27.** 484 U.S. at ——, 108 S.Ct. at 2728, 101 L.Ed.2d at 759.

**28.** Or otherwise is not in compliance with the conditions of the grants. *Id.* at ——, 108 S.Ct. at 2727, 101 L.Ed.2d at 758.

**29.** *Id.* at ——, 108 S.Ct. at 2727, 101 L.Ed.2d at 758.

**30.** *Id.*

**31.** *Id.* at ——, 108 S.Ct. at 2728, 101 L.Ed.2d at 759.

**32.** *Id.*

**33.** *Id.*

**34.** *Id.*

**35.** 28 U.S.C. § 1331 (1982).

**36.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at ——, 108 S.Ct. at 2728, 101 L.Ed.2d at 759–760. While this action was pending, HHS disallowed other expenditures for Massachusetts' intermediate care facility programs. The state again exhausted its administrative remedies and added its claims therefor. *Id.* at ——, 108 S.Ct. at 2728–2729, 101 L.Ed.2d at 760.

**37.** *Id.* at ——, 108 S.Ct. at 2729, 101 L.Ed.2d at 760.

**38.** *Id.* at ——, 108 S.Ct. at 2729, 101 L.Ed.2d at 760 (citation omitted). The Court of Appeals for the First Circuit affirmed the ruling that HHS had unlawfully disallowed the benefits sought, but reversed the first injunction ordering the payment of money, holding that if the Secretary persisted in refusing to pay the sum it owed the state for reasons that the courts had held unlawful, the state's proper remedy "would be a suit for money past due under the Tucker Act in the Claims Court." *Id.* at —— & n. 13, 108 S.Ct. at 2730 & n. 13, 101 L.Ed.2d at 761 & n. 13. The Supreme Court, however, reversed, holding on alternative grounds that (1) the District Court's order was for specific relief, and therefore was not an impermissible money judgment against the United States, *id.* at ——, 108 S.Ct. at 2740, 101 L.Ed.2d at 773–774, and (2) that once the District Court had jurisdiction to reach the merits under § 702, it had power to

704's barrier to APA reviews of agency action "for which there is [an] adequate remedy in a court." [39]

### 1. "Money Damages" in 5 U.S.C. § 702

The money damages limitation was added to Section 702 by a 1976 amendment which indisputably was "intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." [40] The Court found that the amendment did not bar the state's suit for two reasons:

First, insofar as the complaint sought declaratory and injunctive relief, it was certainly not an action for money damages. Second, and more importantly, even the monetary aspects of the relief that the State sought are not "money damages" as that term is used in the law.[41]

As to the second point, the Court emphasized that its

cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order for the reinstatement of an employee with back pay, or for "the recovery of specific property *or monies*, ejectment from land, or injunction either directing

or restraining the defendant officer's actions." [42]

The Court differentiated a suit envisioning reversal of a disallowance decision from one for damages as recompense for an injury. The distinguishing factor was that Massachusetts did not request monetary compensation for a legal wrong suffered; rather, it sought the very thing which it has been deprived of which happened to be the payment of money. The Court drew liberally on this circuit's *Maryland Department of Human Resources*,[43] and observed that

Maryland is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds. *If the program in this case involved in-kind benefits this would be altogether evident.* The fact that in the present case it is money rather than in-kind benefits that pass from the federal government to the states (and then, in the form of services, to program beneficiaries) cannot transform the nature of the relief sought—specific relief, not relief in the form of damages.[44]

As examples of statutes providing compensation for legal injuries, the Court mentioned the Back Pay Act [45] and a now-repealed law [46]

grant any form of relief authorized by § 706. *Id.* at ——, 108 S.Ct. at 2741, 101 L.Ed.2d at 775.

**39.** 484 U.S. at —— nn. 14, 15, 108 S.Ct. at 2730–2731 nn. 14, 15, 101 L.Ed.2d at 762 nn. 14, 15.

**40.** 484 U.S. at ——, 108 S.Ct. at 2731, 101 L.Ed.2d at 762. In full text, the 1976 amendment reads:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

Pub.L. No. 94–574, § 1, 90 Stat. 2721 (1976) (codified at 5 U.S.C. § 702 (1982)).

**41.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at ——, 108 S.Ct. at 2731, 101 L.Ed.2d at 763.

**42.** 484 U.S. at ——, 108 S.Ct. at 2731, 101 L.Ed. 2d at 763–764 (citing *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628, 1635 (1949)) (emphasis in original).

**43.** *Supra* note 13.

**44.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at ——, 108 S.Ct. at 2732–2733, 101 L.Ed.2d at 765, (quoting *Maryland Dep't of Human Resources v. HHS, supra* note 13, 246 U.S.App.D.C. at 185, 763 F.2d at 1446) (emphasis added).

**45.** 5 U.S.C. § 5596 (1982 & Supp. V 1987).

**46.** Act of March 30, 1814, ch. 37, § 14, 3 Stat. 113, 115 (repealed 1962).

which provided compensation to prisoners of war[.] These laws attempt to compensate a particular class of persons for past injuries or labors. In contrast, the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures.[47]

Lastly, the Court spurned HHS's contention that the legislative history supported the conclusion that "money damages" actually meant something more, and excluded from APA review any action seeking "monetary relief."[48] The Court found

no evidence that any legislator in 1976 understood the words "money damages" to have any meaning other than the ordinary understanding of the term as used in the common law for centuries. No one suggested that the term was the functional equivalent of a broader concept such as "monetary relief" and no one proposed that the broader term be substituted for the familiar one.[49]

Rather, the Court noted, the Senate and House Reports both indicated that administration of federal grant-in-aid programs would be reviewable by virtue of the amendment.[50] Since Massachusetts asked only for an injunction correcting an assertedly unlawful disallowance decision, it did not seek money damages within the meaning of Section 702, and therefore federal sovereign immunity was waived.

### 2. "No Other Adequate Remedy in a Court" in 5 U.S.C. § 704

Moving on to Section 704, the court found that while its purpose was mainly to codify the exhaustion requirement,[51] it was also designed to ensure that courts acting under authority of Section 702 did not duplicate or preempt "special and adequate review procedures" in other legislation,[52] such as the National Labor Relations Act's provision for direct review of Board orders in the courts of appeals, the now-extinct provision for review of the Interstate Commerce Commission's orders in three-judge district courts, or the Interstate Commerce Act's present provision for direct review of such orders in the courts of appeals.[53] Given the limited purposes for Section 704's enactment, the Court said, it is to be read narrowly.[54]

The Court then inquired as to whether, in the circumstances of the case, the Claims Court could provide the sort of "special and adequate review procedures" that would constitute an "adequate remedy in a court" within the contemplation of Section 704.[55] It found that for three reasons

the remedy available to the State in the Claims Court is plainly not the kind of "special and adequate review procedure" that will oust a district court of its normal jurisdiction under the APA.[56]

First and foremost, the Claims Court lacks the general equitable powers of the district courts, and therefore could not grant the specific prospective relief that was so im-

---

47. *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— n. 42, 108 S.Ct. at 2738 n. 42, 101 L.Ed.2d at 771 n. 42 (citation omitted).

48. *Id.* at ——, 108 S.Ct. at 2733–2736, 101 L.Ed. 2d at 765–768.

49. *Id.* at ——, 108 S.Ct. at 2733, 101 L.Ed.2d at 766.

50. *Id.* at ——, 108 S.Ct. at 2734, 101 L.Ed.2d at 766. The Court also examined the 1970 hearings on the proposed amendment and found that the distinction between "money damages" and "specific relief"—even where it results in the payment of money—was fully supported there as well. *Id.,* 108 S.Ct. at 2734, 101 L.Ed.2d at 766–767.

51. *Id.* at ——, 108 S.Ct. at 2736, 101 L.Ed.2d at 769. The Court compared proposed versions of

this provision with the one actually adopted. *Id.* at ——, 108 S.Ct. at 2736, 101 L.Ed.2d at 769.

52. *Id.* at ——–——, 108 S.Ct. at 2736–2737, 101 L.Ed.2d at 769.

53. *Id.* at —— & nn. 37–38, 108 S.Ct. at 2737 & nn. 37–38, 101 L.Ed.2d at 769–770 & nn. 37–38.

54. *Id.* at ——, 108 S.Ct. at 2737, 101 L.Ed.2d at 770.

55. *Id.* at —— & n. 39, 108 S.Ct. at 2737 & n. 39, 101 L.Ed.2d at 770 & n. 39.

56. *Id.* at ——, 108 S.Ct. at 2737, 101 L.Ed.2d at 770.

portant to Massachusetts.[57] In addition, Claims Court jurisdiction to entertain such suits is not certain.[58] For example, if a state elected to retain disputed funds, as the Medicaid Act authorizes it to do, there would be no sum owing by the Federal Government upon which a Tucker Act suit might be predicated.[59] The state could not maintain its suit until HHS withheld funds from it and thereby jeopardized its program planning.[60] Claims Court jurisdiction is the more questionable because the Medicaid Act does not "mandate compensation" "for past injuries or labors," but instead "subsidize[s] future state expenditures."[61]

Finally, the Court found that review of agency decisions disallowing funds payable under federal grant-in-aid programs required a forum equipped to handle policy questions which might arise.[62] The Court declared

> that a district court would be in a better position to understand and evaluate [lo-

cal law questions that might arise] than a single tribunal headquartered in Washington. . . . More specifically, it is anomalous to assume that Congress would channel the review of compliance decisions to the regional courts of appeals, and yet intend that the same type of questions arising in the disallowance context should be resolved by the Court of Claims or the Federal Circuit.[63]

The Court concluded that, on the facts presented, the Claims Court could not afford a remedy adequate for Massachusetts, and consequently that Section 704 did not bar review in the District Court.[64]

### D. The Present Case

■ We follow the analytical path traveled by the Supreme Court in *Bowen*. At journey's end, we conclude that the District Court possessed jurisdiction over the action brought by appellees.

---

57. *Id.* at ——, 108 S.Ct. at 2737–2738, 101 L.Ed.2d at 771.

58. *Id.* at ——, 108 S.Ct. at 2738, 101 L.Ed.2d at 771.

59. *Id.* at ——, 108 S.Ct. at 2738, 101 L.Ed.2d at 771–772.

60. *Id.*

61. *Id.* at —— n. 42, 108 S.Ct. at 2738 n. 42, 101 L.Ed.2d at 771 n. 42. The Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114, 121 (1976). Accord, *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580, 590 (1983); *Maryland Dep't of Human Resources v. HHS, supra* note 13, 246 U.S.App.D.C. at 187, 763 F.2d at 1448; *National Ass'n of Counties v. Baker, supra* note 24, 268 U.S.App.D.C. at 379, 842 F.2d at 375. Therefore, any suit cognizable in the Claims Court on the basis of its noncontractual jurisdiction—that it is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department," 28 U.S.C. § 1491(a)(1)—must be founded upon a right to money conferred by a statute and accompanied by a right, implied from the terms of the statute, to recover that money. *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— n. 42, 108 S.Ct. at 2738 n. 42, 101 L.Ed.2d at 771 n. 42; *National Ass'n of Counties v. Baker, supra* note 24, 268 U.S.App.D.C. at 378, 842 F.2d at 374; *Maryland Dep't of Human Resources v. HHS,*

*supra* note 13, 246 U.S.App.D.C. at 192, 193–195, 763 F.3d at 1448, 1449–1451. Such causes of action against the United States have only been implied when "the legislation which the claimant cites can fairly be interpreted as mandating compensaton by the Federal Government for the damage sustained." *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— n. 42, 108 S.Ct. at 2738 n. 42, 101 L.Ed.2d at 771 n. 42 (quoting *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967) (cited with approval in *United States v. Testan,* 424 U.S. at 398, 400, 96 S.Ct. at 953, 955, 47 L.Ed.2d at 121, 122 (1976))). Accord, *National Ass'n of Counties v. Baker, supra* note 24, 268 U.S.App.D.C. at 378, 842 F.2d at 374; *Maryland Dep't of Human Resources v. HHS, supra* note 13, 246 U.S.App.D.C. at 188–189, 763 F.2d at 1449–1450.

62. *Bowen v. Massachusetts, supra* note 5, 484 U.S. at ——, 108 S.Ct. at 2739, 101 L.Ed.2d at 772–773. Several times the Court adverted to the "complex questions of federal-state interaction to be reviewed" and noted the inadequacy of a "specialized forum such as the Court of Claims" to handle the task. *Id.* See also *id.* at —— n. 31, —— n. 39, —— n. 46; 108 S.Ct. at 2735 n. 31, 2737 n. 39, 2739 n. 46, 101 L.Ed.2d at 768 n. 31, 770 n. 39, 773 n. 46.

63. *Id.* at ——, 108 S.Ct. at 2739, 101 L.Ed.2d at 772–773 (citation omitted). See also notes 29–30 *supra.*

64. 484 U.S. at ——, 108 S.Ct. at 2736, 101 L.Ed.2d at 768.

#### 1. Section 702

Our first inquiry is whether appellees seek "money damages," as that term was authoritatively defined by *Bowen*.[65] As we have already noted,[66] appellees contend solely for an injunction against an arbitrary or capricious administrative denial of subsidy payments to them. Their suit for the relief, in the words of the Supreme Court, is "certainly not an action for money damages." [67]

Appellees' specific complaint is that the procedures leading up to the Department of Agriculture's decision to deprive them of payments were totally inadequate. The redress they want—a redetermination, in a fair and impartial hearing, of their status under the subsidy statutes—simply is not money damages in compensation for the legal injury they allegedly have suffered.[68] Were more needed, we might add that the monetary value to appellees of proper hearing procedures is highly speculative; on any redetermination, the Department might decide, on the basis of all the facts that appellees still are not entitled to increased benefits.

Indeed, the monetary aspect of any relief appellees might be entitled to is much more a matter of guesswork than either *Bowen* or *National Association of Counties* involved. In *Bowen*,[69] reversal of the administrative decision on the merits resulted inexorably in payment of money from the federal treasury;[70] in *National Association of Counties*,[71] the injunction issued against the Secretary of Treasury forced the release of funds he had withheld.[72] Here, in contrast, a reversal would merely invalidate the reasons proffered for the reduction of benefits, and would require no more than reexamination of the administrative decision on the merits. As will be shown, the Department's factfinding procedures were so plagued with defects that it is impossible to ascertain whether reversal would foreclose a holding, on the basis of properly assembled facts, that appellees are not entitled to larger subsidy payments.[73]

#### 2. Section 704

We now consider whether the Claims Court could provide appellees with the sort of " 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." [74] We conclude that it cannot, and therefore hold that an action therein is not an acceptable alternative to APA review in the District Court.

First and foremost, the Claims Court lacks equitable jurisdiction[75] to award injunctive relief of the type appellees need.[76]

---

**65.** See Part I(C)(1) *supra.*

**66.** See note 5 *supra* and accompanying text.

**67.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —, 108 S.Ct. at 2731, 101 L.Ed.2d at 763.

**68.** *Id.* Of course, appellees hope that upon a redetermination conducted properly, the evidence will lead to a finding that they are entitled to receive money from the Federal Government, but this result is by no means assured or compelled by the injunction they presently request.

**69.** *Supra* note 5.

**70.** See text *supra* accompanying note 27.

**71.** *Supra* note 24.

**72.** 268 U.S.App.D.C. at 375, 842 F.2d at 371.

**73.** See Part II(E) *infra.*

**74.** See note 56 *supra.*

**75.** See note 57 *supra.*

**76.** Although Congress has conferred upon the Claims Court some limited equitable powers, found now at 28 U.S.C. § 1491(a)(2), (3) (1982), they cannot furnish the prospective and immediate relief which appellees seek. As an initial matter, the Claims Court lacks jurisdiction to award temporary relief pending judgment. See *id.* § 1491(a)(2) ("the court may, *as an incident of and collateral to any such judgment*") (emphasis added). Furthermore, such injunctive relief as the Claims Court is authorized to grant is woefully inadequate to the situation here. The Claims Court may only

  issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records.... In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

The District Court found that "[w]ithout relief from this court, [appellees] will lose their farm and be forced into bankruptcy in less than three weeks."[77] When appellees instituted suit, with the goal of warding off their creditors, their bank had suspended their operating loan and called for payment of a $250,000 loan; a manufacturer had repossessed four combines and other equipment; and the holder of the obligation secured by the first deed of trust on their farm was about to foreclose.[78] We have no reason to assume that the need is substantially less urgent.

Second, it is doubtful that the jurisdictional power of the Claims Court extends to the suit in question. Appellees, we repeat, assert no claim for a sum immediately due and owing by the Federal Government.[79] The statute undergirding their suit does not mandate compensation.[80] Similarly to the one involved in *Bowen*, it "directs the Secretary to pay money[,] ... not as compensation for a past wrong, but to subsidize future ... expenditures."[81] Nor do appellees predicate their bid for relief upon the provisions of the contract they have negotiated with the Department of Agriculture.[82] And, like the *Bowen* Court,[83] we believe that district courts are better equipped to understand and evaluate the various factual circumstances of these cases than is the Claims Court, headquartered in Washington, far removed from the controversy, and inconvenient to most of those likely to become litigants.

Accordingly, we conclude that the Claims Court does not possess the kind of review procedures which would displace the District Court's APA jurisdiction over appellees' suit. We thus proceed to the merits of the case.

## II. THE MERITS

### A. *The Regulatory Framework*

Consideration of the merits begins logically with an examination of the regulations promulgated by the Secretary of Agriculture under two federal agricultural subsidy programs, the price support of agricultural commodities program[84] and the conservation reserve program.[85] These are administered by the Secretary[86] through his delegates, the Administrator of the Agricultural Stabilization and Conservation Service, the Deputy Administrator, and State and County Agricultural Stabilization and Conservation Committees.[87]

---

*Id.* § 1491(a)(2). Even assuming appellees' claim could be construed as an action on a contract, which it cannot, see note 13, *supra*, the court's equitable power in contract actions is limited to those brought *"before the contract is awarded...." id.* § 1491(a)(3) (emphasis added).

**77.** *Esch v. Lyng, supra* note 1, 665 F.Supp. at 14.

**78.** *Id.* In fact, appellees' circumstances were so dire that even the District Court's preliminary injunction did not allay their creditors' concerns. *Id.* at 16 n. 1.

**79.** See note 5 *supra* and accompanying text. This case cries out for application of the common law doctrine that specific relief is available when money damages are inadequate. Considering the speculative nature of the value to appellees of proper administrative hearing procedures, appellees hardly could expect to recover in money damages more than the expenses incurred in attacking the inadequacy of the agency's procedures. They would not be entitled to any of the money they hope to ultimately receive.

**80.** See note 61 *supra*.

**81.** *Bowen v. Massachusetts, supra* note 5, 484 U.S. at —— n. 42, 108 S.Ct. at 2738 n. 42, 101 L.Ed.2d at 771 n. 42.

**82.** See note 13 *supra*.

**83.** See notes 62–64 and accompanying text.

**84.** Agricultural Act of 1949, ch. 792, Pub.L. No. 81–439, 63 Stat. 1051 (codified as amended at 7 U.S.C.A. § 1421 *et seq.* (1982 and West Supp. 1989)) [hereinafter cited as codified].

**85.** Food Security Act of 1985, Pub.L. No. 99–198, tit. XII, 99 Stat. 1509 (codified as amended at 16 U.S.C.A. § 3831 *et seq.* (West Supp. 1989)) [hereinafter cited as codified]. Under the conservation reserve program, the Federal Government pays farmers to take agreed-upon amounts of land out of production for ten-year periods. *Esch v. Lyng, supra* note 1, 665 F.Supp. at 8.

**86.** 7 U.S.C. § 1421(a), (b) (price support program); 16 U.S.C. § 3831 (conservation reserve program).

**87.** 7 C.F.R. § 713.2 (1988) (price support program); *id.* § 704.3 (1988) (conservation reserve

Both statutes authorize the Secretary to make payments not exceeding $50,000 to each "person" qualifying.[88] Both empower the Secretary to define the word "person,"[89] which he has done.[90] By the Secretary's definition, partnerships are not to be treated as a single person; rather, each individual who "shares in the proceeds" of a partnership is deemed a separate person so long as he or she

> is actively engaged in the farming operations of the partnership.... An individual ... shall be considered as actively engaged in the farming operation only if its contribution to the joint operation is commensurate with its share in the proceeds derived from farming by such joint operation. Members of the partnership ... must furnish satisfactory evidence that their contributions of land, labor, management, equipment, or capital to the joint operation are commensurate with their claimed shares of the proceeds.[91]

Farmers seeking subsidy payments apply to the County Agricultural and Stabilization Committees, which review the applications. State Agricultural and Stabilization Committees oversee the work of the county committees, and have authority to revise decisions of the county committees or require them to do so.[92] The Deputy Administrator of State and County Offices oversees the work of the state and county committees.[93]

The Secretary is also empowered to promulgate regulations governing administrative appeal procedures.[94] Any producer or participant[95] who is dissatisfied with a decision made at any level may request reconsideration thereof.[96] Those who remain unhappy after a county committee has reconsidered its decision may appeal to the state committee;[97] those displeased with the decision of a state committee may appeal to the Deputy Administrator.[98] At each level the participant is entitled to an informal hearing[99] at a time and place des-

program) [hereinafter all cites to C.F.R. will refer to the 1988 edition unless otherwise indicated].

**88.** Price support program: Pub.L. No. 97–98, 95 Stat. 1263 (1981) (codified at 7 U.S.C. § 1308 (1982)) (payment limitations for wheat, feed grains, upland cotton and rice for crop-years 1982–1985), amended by Food Security Act of 1985, Pub.L. No. 99–198, tit. X, § 1001, 99 Stat. 1444 (codified as amended at 7 U.S.C.A. § 1308 (West Supp.1989)) (same for crop-years 1987–1990). See also 7 C.F.R. § 713.1(b).

Conservation reserve program: 16 U.S.C.A. § 3834(f)(1) (West Supp.1989) ($50,000 maximum payable to owner or operator). See also 7 C.F.R. § 704.16(c) ("[t]he maximum amount of rental payments which a person may receive under the [conservation reserve program] for any fiscal year shall not exceed $50,000"). Payments received under the conservation reserve program are in addition to those a person is eligible to receive under the price support programs. 16 U.S.C.A. § 3834(f)(3) (West Supp. 1989).

**89.** 7 U.S.C. § 1308(5) (1982) (price support program for 1982 through 1985 crops), and *id.* as amended (Supp. IV 1986) (price support program for 1987 through 1990 crops); 16 U.S.C. § 3834(f)(2)(A) (Supp. V 1987), and 16 U.S.C. § 3844 (Supp. V 1987) (conservation reserve program).

**90.** 7 C.F.R. pt. 795, made applicable to the price support program by *id.* § 713.1(b), and to the

conservation reserve program by *id.* § 704.16(c).

**91.** *Id.* § 795.7.

**92.** *Id.* § 713.2(c) (price support program); *id.* § 704.3(f) (conservation reserve program).

**93.** *Id.* § 713.2(d) (price support program); *id.* § 704.3 (conservation reserve program).

**94.** 7 U.S.C. § 1469 (Supp. IV 1986) (price support program); 16 U.S.C. § 3843(a) (Supp. IV 1986) (conservation reserve program).

**95.** "Producer or participant" is defined as "any person whose right to participate or receive payments, ... under any of the programs covered by these regulations, is affected by a determination of the county committee, State committee, or Deputy Administrator." 7 C.F.R. § 780.2(b).

**96.** *Id.* § 780.3. The appeal regulations are made applicable to the price support program by *id.* § 713.155 and to the conservation reserve program by *id.* § 704.27.

**97.** *Id.* § 780.4.

**98.** *Id.* § 780.5.

**99.** *Id.* §§ 780.3–780.5.

ignated by the reviewing body.[100]

Reviewing authorities are indulged wide discretion in conducting hearings,[101] but must advise the participant of the issues involved.[102] The participant must "be given a full opportunity to present facts and information relevant to the matter in issue and may present oral or documentary evidence." [103] Additionally, "[t]he reviewing authority [must] have prepared a written record containing a clear, concise statement of the facts as asserted by the producer or participant and material facts as found by the reviewing authority." [104] And "[w]hen a producer requests copies of documents, information, or evidence upon which a determination is made or which will form the basis of the determination, copies of such documents, information or evidence shall be made available...." [105]

## B. *The Factual and Procedural Background*

In 1986, appellees applied, as a nine-person partnership, to the Baca County Committee for price support payments.[106] They also submitted a bid for participation in the conservation reserve program.[107] The committee accepted the application and the bid for a conservation reserve program contract, which led to withdrawal of 12,000 of appellees' acres from production. In both programs, appellees were to be reimbursed as a nine-person partnership.[108]

In October, 1986, without formal notice or hearing, the Department of Agriculture suspended payments to appellees under both programs.[109] Appellees were told that the payments, which at that time amounted to $628,000,[110] were being suspended until the Department's Office of Inspector General concluded an audit of their filings with the Baca County Committee.[111]

A month earlier, appellees Patrick and Dennis Esch, who had heard that the Office of Inspector General was auditing the Baca County Committee, traveled to Denver to meet with officials of the State Agricultural Stabilization and Conservation Committee.[112] The Eschs were concerned that suspension of their eligibility under the conservation reserve program would not only deprive them of $450,000 in payments, but also the opportunity to farm the 12,000 acres covered by the conservation reserve program agreement.[113] The state committee told them that their conservation reserve program contract would remain in effect unless and until the state office informed them otherwise.[114] In reliance, thereon, appellees did not plant wheat during the winter season.[115]

The Office of Inspector General apparently concluded its audit in December,

100. *Id.* § 780.8(a).

101. *Id.* § 780.8(b).

102. *Id.*

103. *Id.* § 780.8(c).

104. *Id.* § 780.8(d).

105. *Id.* § 780.9(b); see also *id.* pt. 798.

106. *Esch v. Lyng, supra* note 1, 665 F.Supp. at 9.

107. *Id.*

108. *Id.*

109. *Id.* at 7, 9. The Department does not dispute the lack of notice. The Assistant Deputy Administrator in the final agency decision after reconsideration, explained that appellees "well understood" that the problem was with their "person" determination, and that

[a]ccordingly, it appears to be moot as to whether or not there was a separate writing forwarded to the Eschs concerning the withholding of the payments. However, we note, in addition to the fact that the Eschs knew well that the payments the Eschs argue are due had not been paid, the Eschs were also aware that an audit of their operation was being conducted by the Office of Inspector General.

Letter from Thomas A. Von Garlem, Assistant Deputy Administrator, to Alexander J. Pires, Jr. (May 11, 1987) at 2, Appellant's Appendix (A.App.) 9.

110. *Esch v. Lyng, supra* note 1, 665 F.Supp. at 9.

111. *Id.* at 9–10.

112. *Id.* at 9.

113. *Id.*

114. *Id.*

115. *Id.*

1986.[116] It had not interviewed any of the members of the Baca County Committee, despite the Department's usually heavy reliance upon the decisions of such committees.[117] The audit recommended that appellees be considered a one-person partnership for purposes of payments under the price support program, and a two-person partnership for payments under the conservation reserve program.[118] And in spite of their numerous requests, the Eschs were not given a copy of the audit at that time.[119]

On January 16, 1987, again without notice to the appellees or any kind of hearing, the state committee adopted the Office of Inspector General's findings.[120] The committee did not explain the reasons underlying its decision.[121] On February 2, 1987, appellees appeared before the committee in an effort to obtain reconsideration of its decision.[122] The committee accepted appellees' presentation,[123] but did not inform them of the nature of the problems later identified in the administrative findings.[124] Instead of rendering a decision, the committee forwarded the matter to the Deputy Administrator.[125] On March 16, 1987, before appellees submitted evidence, the state committee informed appellees by letter that the Deputy Administrator concurred in the findings of the Office of Inspector General audit.[126] Neither the committee nor the Deputy Administrator provided any explanation for the latter's decision.[127] Appellees traveled to Washington, D.C., and filed for reconsideration of that decision on March 20, 1987.[128]

On March 31, however, because their creditors were foreclosing on the farm's assets, appellees instituted this suit in the District Court, seeking first a temporary restraining order.[129] That was denied,[130] but the Department agreed to an expedited hearing on appellees' claims.[131]

The Deputy Administrator's delegate held the hearing on April 7, 1987, and the Deputy Administrator on April 15 issued a written decision affirming his earlier decision.[132] This marked the first time that appellees were informed of the basis for the decision to deny benefits to them as a nine-person partnership.[133] Appellees sought reconsideration of part of the *April 15 Decision*, and appeared before the same appeals officer on April 29.[134] On May 6, they were again denied the relief they sought.[135] The Deputy Administrator supplemented the *May 6, 1987 Decision* on

116. *Id.* at 10.

117. *Id.* at 13 & n. 4 (testimony of Assistant Deputy Administrator Thomas Von Garlem at preliminary injunction hearing); see also *id.* at 21. Nor did the Office of Inspector General conduct any interview of personnel of the Farmers Home Loan Administration, one of the agencies the audit accused appellees of deceiving. *Id.*

118. *Id.* at 10.

119. *Id.* at 10 & n. 2. Appellee Dennis Esch testified before the District Court that he repeatedly asked for a copy of the audit, that the copy he was ultimately furnished was illegible and was received only after he had succeeded in getting a copy through other channels. *Id.*

120. *Id.* at 10.

121. *Id.*

122. *Id.*

123. *Id.*

124. *Id.* at 8.

125. *Id.* at 10.

126. *Id.* at 10, 18.

127. *Id.* at 18.

128. *Id.* at 10, 22.

129. *Id.* at 10.

130. *Id.*

131. *Id.*

132. *Id.*

133. *Id.* at 8, 18, 19. The decision is in the form of a letter. See Letter from Earle J. Bedenbaugh, Deputy Administrator, to Alexander J. Pires, Jr. (April 15, 1987) [hereinafter *April 15 Decision*], A.App. 1.

134. *Esch v. Lyng, supra* note 1, 665 F.Supp. at 10.

135. *Id.;* Letter from Earle J. Bedenbaugh, Deputy Administrator, to Alexander J. Pires, Jr. (May 6, 1987) [hereinafter *May 6 Decision*], A.App. 5.

May 11, and once again denied appellees relief.[136]

The District Court held a two-day hearing on appellees' motion for a preliminary injunction.[137] It then enjoined any suspension of appellees' participation in the price support and conversation reserve programs as a nine-person partnership, pending hearing of a motion for a permanent injunction.[138] Later, after a hearing, the court issued an order granting a permanent injunction restraining any denial of subsidy payments to appellees as a nine-person farm for the 1987 crop-year, and remanding the case to the Department for a redetermination of appellees' person status for subsequent years.[139]

## C. The Agency Rationales

Appellees have been accused of numerous activities which, independently or in combination might, if true, justify a limitation of their participation to that of a one- or two-person partnership for subsidy payment purposes.[140] These accusations include charges that appellees failed to disclose accurate and complete information to the county committee in 1984,[141] and supplied incorrect, inaccurate and misleading information to the county committee in 1986, thus "clearly indicat[ing] [appellees'] lack of good faith and [susceptible of interpretation] as a device designed to evade the payment limitation rules." [142]

The facts underlying these characterizations were that in 1984 appellees conveyed conflicting information to the Baca County Committee and the Farmers Home Loan Administration concerning the number of persons who owned and operated the farm.[143] In 1986 the appellees allegedly provided "incorrect information pertaining to the contributions of land, labor, capital, equipment, and management[ ]" [144] to the Baca County Committee in support of their

---

**136.** Letter from Thomas A. Von Garlem, Assistant Deputy Administrator, to Alexander J. Pires, Jr. (May 11, 1987) [hereinafter *May 11 Decision*], A.App. 8.

**137.** *Esch v. Lyng, supra* note 1, 665 F.Supp. at 15.

**138.** *Id.*

**139.** *Id.*

**140.** 7 C.F.R. § 795.17 provides:
All or any part of the payments otherwise due a person ... may be withheld or required to be refunded if the person adopts or participates in adopting any scheme or device designed to evade or which has the effect of evading the rules of this part. Such acts shall include, but are not limited to, concealing from the county committee any information having a bearing on the application of the rules of this part or submitting false information to the county committee ... or creating fictitious entities for the purpose of concealing the interest of a person in a farming operation.
Assistant Deputy Administrator Thomas Von Garlem testified in the District Court on enforcement of this provision:
[W]e have tried to not get into scheme and device and just say that if you don't follow the rules, the best you can get is what you would have earned had you followed the rules.... I don't know which is the best way to approach, but we approached it saying, "Look, we don't agree with all the data that you gave us and we believe, based on the data we have, that the shares are not commensurate and that you're only eligible for one payment limitation", as compared to the other option of saying, "it was a scheme and device, you're not eligible for any benefits", et cetera.
*Esch v. Lyng, supra* note 1, 665 F.Supp. at 21. The District Court observed that
there are occasions when Von Garlem continues to "hold(s) (sic) to the decision that the contributions are not commensurate" but nonetheless has proposed a redistribution of the percent of shares on paper to be able to regard each farmer partner as a separate person for payment limitation purposes, thereby increasing the person determination.
*Id.* at 22.

**141.** *April 15 Decision, supra* note 133, at 3–4, A.App. 3–4 (number of partner/owners of the farm and the provision of conflicting information to two federal agencies). See also *May 6 Decision, supra* note 135, at 1, A.App. 6 (number of farm owners).

**142.** *May 6 Decision, supra* note 135, at 1, A.App. 5 (ASCS Form 561 Farm Operating Plan); *April 15 Decision, supra* note 133, at 4, A.App. 4 (same).

**143.** They applied for price support payments as a four-person farm with the county committee, and two of their members applied to the Farmers Home Loan Administration for a loan as a two-person partnership. *April 15 Decision, supra* note 133, at 3, A.App. 3.

**144.** *Id.* at 4, A.App. 4.

application for price support payments.[145] Some of the allegations in this respect rest upon an administrative finding that a series of transfers between and among the Esch brothers and sisters amounted to nothing more than a paper transaction, and therefore must be disregarded under the regulations.[146] In addition, appellees' farm operating plan allegedly was untimely submitted.[147]

The net effect of appellant's rulings was tumultuous. In 1984, appellees' application for price support benefits as a four-person farm was reduced to a one-person basis for payment limitation purposes.[148] In 1985, their application for price support payments was cut from nine-persons to one-person.[149] The Deputy Administrator, however, forgave the repayment debt because the Baca County Committee "failed to obtain the proper documents, including farm operating plans, from [appellees] prior to the time crops could have normally been planted in the area." [150] Appellees' 1986 application for benefits under both the price support and the conservation reserve programs was also lowered from nine-persons to one-person.[151] However, appellees were also reprieved from repayment of the extra amounts received for that year for the same reason repayment was forgiven

for 1985.[152] But, on the sole ground that appellees had provided conflicting information to two federal agencies,[153] they were refused relief from the obligation to refund overpayments for the 1984 crop-year.

Appellees' 1987 application for benefits under the price support and conservation reserve programs as a nine-person farm led the Department to extend to them the option of terminating their conservation reserve contracts without liquidated damages or continuing performance as a one-person farm.[154] Appellees were denied a dispensation for the 1987 crop-year on the ground that their farm operating plan in support of their conservation reserve application "contained inaccurate and misleading information, which clearly indicate[d] [appellees'] lack of good faith." [155]

### D. *The Issues and Their Resolution*

The Department makes two last-ditch arguments in an effort to win a reversal without reaching the propriety of the District Court's injunction. The Department contends that the administrative disposition of appellees' subsidy claims is made unreviewable by statute.[156] Alternatively, the Department argues that the District Court erred in admitting and considering testimony from agency decisionmakers disclosing

145. *Id.; May 6 Decision, supra* note 135, at 3, A.App. 6–7. See also *May 11 Decision, supra* note 136, at 4, 6, A.App. 11, 13.

146. *April 15 Decision, supra* note 133, at 2, A.App. 2; *May 6 Decision, supra* note 135, at 3, A.App. 7. Appellant purports to apply the provisions of 7 C.F.R. § 795.14 (Changes in farming operations).

147. *April 15 Decision, supra* note 133, at 4, A.App. 4; *May 6 Decision, supra* note 135, at 1, A.App. 5.

148. *April 15 Decision, supra* note 133, at 2, A.App. 2.

149. *Id.*

150. *Id.* at 3–4, A.App. 3–4, as amended, supplemented and explained by the *May 6 Decision, supra* note 135, at 1, A.App. 5.

151. *April 15 Decision, supra* note 133, at 2, A.App. 2.

152. See note 150 *supra* and accompanying text.

153. *April 15 Decision, supra* note 133, at 4, A.App. at 4.

154. *Id.* The Deputy Administrator did not discuss appellees' status under the price support program.

155. *May 6 Decision, supra* note 135, at 1, A.App. 5. It also appears that during the course of the District Court's hearing on the preliminary injunction motion, the Department for the first time accused appellees of fraud and collusion. *Esch v. Lyng, supra* note 1, 665 F.Supp. at 18. These charges were later abandoned. *Id.*

156. The Department relies on 7 U.S.C. § 1385 (Supp. IV 1986) which in relevant part, provides that "[t]he facts constituting the basis for ... any payment under [a farm subsidy program], any loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary[,] ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government."

the manner in which those claims were processed. We need not tarry long over either contention.

### 1. Reviewability

■ The statute upon which the Department predicates its nonreviewability thesis is by its own terms inapplicable here. It confers finality only upon the "facts constituting the basis" for the Department's program decisions,[157] and only when those facts are "officially determined in accordance with the applicable regulations prescribed by the Secretary." [158] Section 1385 poses no obstacle to decision of legal questions.[159] Consequently, the validity of the procedures utilized in reaching a determination,[160] including the consistency of those procedures with agency regulations,[161] are open to judicial exploration. Nothing we need do on this review takes us beyond the range permissible.[162]

### 2. Supplementation of the Agency Record

It is well settled that an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide them.[163] The Department has adopted regulations specifying the procedures to be followed on administrative appeals,[164] and appellees insist that in several respects they have been ignored. The Department, on the other hand, invokes the familiar rule that judicial review of agency action is normally to be confined to the administrative record.[165] That principle exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny; in the present case, the procedural validity of the Department's action also remains in serious question. Particularly in the latter context, it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective.

Not surprisingly then, the courts have developed a number of exceptions countenancing use of extra-record evidence to that end. As recently summarized by two commentators, exceptions to the general rule have been recognized

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.[166]

---

**157.** See note 156 *supra.*

**158.** See note 156 *supra.*

**159.** *United States v. Batson,* 782 F.2d 1307, 1311–1312 (5th Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986); *Aycock–Lindsey Corp. v. United States,* 171 F.2d 518, 522 (5th Cir.1948); *Raines v. United States,* 12 Cl.Ct. 530, 537 (1987).

**160.** *Prosser v. Butz,* 389 F.Supp. 1002, 1005 (N.D. Iowa 1974).

**161.** *Garvey v. Freeman,* 397 F.2d 600, 605 (10th Cir.1968); *King v. Bergland,* 517 F.Supp. 1363, 1365 (D.Colo.1981).

**162.** See Part II(E) *infra.*

**163.** *Service v. Dulles,* 354 U.S. 363, 379–380, 77 S.Ct. 1152, 1160–1161, 1 L.Ed.2d 1403, 1414 (1957); *Reuters Ltd. v. FCC,* 251 U.S.App.D.C. 93, 781 F.2d 946 (1986); *Panhandle Eastern Pipeline Co. v. FERC,* 198 U.S.App.D.C. 387, 402 & n. 84, 613 F.2d 1120, 1135 & n. 84 (1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).

**164.** 7 C.F.R. pt. 780. See also text *supra* at notes 94–105.

**165.** *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–744, 105 S.Ct. 1598, 1607, 84 L.Ed. 2d 643, 656 (1985); *Doraiswamy v. Secretary of Labor,* 180 U.S.App.D.C. 360, 367–371, 555 F.2d 832, 839–843 (1976) (and cases cited therein).

**166.** Stark & Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action,* 36 Admin.L.Rev. 333, 345 (1984). The caselaw supports these applications. See, e.g., *National Nutritional Foods Ass'n*

We ourselves have had occasion to go outside the administrative record in order to evaluate a claim not different in character from the one advanced here. In *Natural Resources Defense Council v. Train,*[167] litigants challenged an agency decision in the District Court and presented an affidavit making a substantial showing that the agency had not filed the entire administrative record with the court. Despite this, the court conducted its review on the administrative record just as it was, and that we held to be error.[168] We pointed out that omitted from the record was a report shedding light on the factors and considerations relied upon by the agency, and declared that

> [s]ince the [agency] now concedes that this document is part of the administrative record it should have been made available to the District Court and to the plaintiffs in that court.[169]

### E. Procedural Deficiencies

■ The Department's regulations entitle a dissatisfied program participant to a multi-level appeal,[170] and an informal hearing at each successive level.[171] The regulations also call upon the hearing officer to conduct the hearing "in the manner deemed most likely to obtain the facts relevant to the matter in issue[;]"[172] to inform the participant of the issues involved in the hearing;[173] to allow the participant an opportunity to present oral and documentary evidence;[174] to prepare a written record containing a concise statement of the evidence proffered by the participant and the facts found by the reviewing officer;[175] and, upon request, to furnish copies of any documentary evidence or other records or information upon which the determination will rely.[176]

The Department failed woefully in complying with the hearing requirement. There was no hearing at all at the county level.[177] None of the proceedings that did occur[178] was conducted in a manner conducive to obtaining the relevant facts. The Office of Inspector General never interviewed either appellees, the Baca County Committee members, or members of the local Farmers Home Loan Administration, despite their proximity to appellees' operation of their farm on a day-to-day basis,[179] and the usual reliance of the Department

*v. Weinberger,* 512 F.2d 688, 701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 239 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Friends of the Earth v. Hintz,* 800 F.2d 822, 828–829 (9th Cir.1986); *American Mining Congress v. Thomas,* 772 F.2d 617, 626–627 (10th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986).

167. 171 U.S.App.D.C. 151, 519 F.2d 287 (1975).

168. *Id.* at 155, 519 F.2d at 291.

169. *Id.* at 155–156, 519 F.2d at 291–292.

170. 7 C.F.R. §§ 780.3, 780.4, 780.5.

171. 7 C.F.R. § 780.3.

172. 7 C.F.R. § 780.8(b).

173. *Id.*

174. *Id.* § 780.8(c).

175. *Id.* § 780.8(d).

176. *Id.* § 780.9(b).

177. See text *supra* at notes 109–127. Appellees challenged the adequacy of their hearing before the state committee while still administratively appealing. Later in the appellate process the Deputy Administrator rejected appellees' argument that the state committee's failure to issue a decision on reconsideration violated their procedural rights. He then noted that

> insofar as this particular proceeding is concerned, the regulations are binding on this point in this proceeding as the regulations constitute a determination by the Secretary of the Secretary's statutory responsibilities.

*May 11 Decision, supra* note 136, at 3, A.App. 10 (emphasis added).

178. Rehearings at the state and Deputy Administrator levels. *Id.*

179. See note 117 *supra.* See also *May 11 Decision, supra* note 136, at 1, A.App. 8 ("there was no evidentiary hearing in 1985 before the county committee"). Obviously troublesome is the state committee's apparent reliance solely upon the summary of the Inspector General's audit when it made its determination. *April 15 Deci-*

on these committees.[180] Not until very late in the appellate process were appellees informed of the nature of the asserted inadequacies of their applications, a failure severely impairing their right and ability [181] to adduce relevant evidence at all stages of that process.[182]

Neither the county nor the state committee ever compiled a written record of the proceedings before them, the facts they found or the reasons for their decisions.[183] Indeed, the county and state committees and the Deputy Administrator made their initial decisions without any sort of hearing at all.[184] And, despite numerous requests therefor, appellees were not promptly provided with a copy of the audit which afforded the basis of most of the administrative decisions. The copy they eventually received from the Department was illegible.[185]

The procedural defaults listed here are by no means a full list.[186] They suffice, however, to fully justify the District Court's conclusion that there were serious questions as to whether the adjudicative officials at any given point considered all relevant factors in reaching their determinations. Consideration of all relevant factors includes at least an effort to get both sides of the story.[187] Consequently, the District Court properly allowed appellees to supplement the record before it with documentary evidence,[188] and the testimony of the agency decisionmakers. Only by examining the underlying facts, which appellant never gathered in a coherent record, could the court determine whether appellees got their procedural just due.

We therefore hold that supplementation of the record was proper.

## III. CONCLUSION

The District Court held not only that the suspension of benefits for crop-year 1987 was procedurally defective, but also was substantively unsupportable. On both grounds, the court itself set aside the suspension for that year, and remanded to the Department for a determination of benefits for subsequent years. The court erred in making the substantive decision on benefits for 1987. On the present record, it cannot be said that the Department must inexorably conclude that appellees were a nine-person farm during 1987. When the court found invalid the procedures leading to the 1987 crop-year suspension, it should have remanded the case to the Department for reconsideration of appellees' entitlement for that year. We accordingly modify the court's injunction to provide that the Department must redetermine appellees' person status for 1987 as well as subsequent periods, and as so modified, we affirm the judgment under review.

*So ordered.*

---

sion, *supra* note 133, at 1, A.App. 1; see also *Esch v. Lyng, supra* note 1, 665 F.Supp. at 10.

**180.** See text *supra* at note 117.

**181.** See text *supra* at notes 103, 174.

**182.** Further hampering appellees' attempts to prepare for such proceedings as they were afforded was complete lack of notice of either the state committee's or the Deputy Administrator's initial decisions. See notes 109, 120, 126 *supra* and accompanying text. In fact, at the state level, they were reassured by the state committee itself that future payments would not be terminated without notice. See text *supra* at note 114.

**183.** See text *supra* at notes 121, 127.

**184.** See text *supra* at notes 120, 126.

**185.** See note 119 *supra* and accompanying text.

**186.** For the many other infirmities found by the District Court, see generally *Esch v. Lyng, supra* note 1.

**187.** See notes 172–175 *supra* and accompanying text.

**188.** Appellant's regulations require that affected participants be allowed to introduce any relevant documentary evidence. See 7 C.F.R. § 780.8(c).